Filed 9/4/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| JEFFREY G. GROSSMAN et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> JOHN PETER WAKEMAN, JR., et al., <br><br> Defendants and Appellants. | 2d Civ. No. B329459 <br> (Consl. w/ B332351) <br> (Super. Ct. No. 56-2014-00456442-PR-TR-VTA) <br> (Ventura County) |

Attorney John Peter Wakeman, Jr. (Wakeman), and Wakeman Law Group, Inc., appeal the legal malpractice judgments entered against them following a jury trial. The judgments were in favor of respondents Jeffrey G. Grossman (Jeffrey), Alexis Grossman (Alexis), and Nicholas Grossman (Nicholas). They also appeal an order denying their motion for judgment notwithstanding the verdict. We reverse the judgments.

Respondents were not appellants' clients. Appellants' client was Dr. A. Richard Grossman (Richard), the father of Jeffrey and Peter Grossman (Peter). Peter is the father of Alexis

and Nicholas, hereafter "the grandchildren." During the trial, Richard was described as "a huge name in the . . . burn surgery community" who "had started the Grossman Burn Centers."

Richard died in March 2014 at the age of 81. His estate was valued at $18 million. Richard's 2012 estate planning documents, prepared by appellants, disinherited respondents and Peter. Richard's entire estate was left to his fourth wife, Elizabeth Grossman (Elizabeth), even though she was independently wealthy. Richard married Elizabeth in 2000, and they remained married until his death.

Although Richard's 2012 estate planning documents disinherited respondents, in a special verdict the jury expressly found that respondents were "the intended beneficiaries of" the documents. The jury further found that appellants had "breach[ed] the standard of care in the preparation" of the documents and that respondents had been damaged by appellants' negligence. The jury awarded damages totaling $9.5 million: $4.75 million to Jeffrey and $4.75 million to the grandchildren.

Appellants allege that they "owed no duty to [respondents]." They "owed a duty only to the decedent, Richard Grossman." Appellants contend, "[T]he absence of . . . a duty to [respondents] establishes that [they] cannot be liable to [respondents], since duty is an essential element of a malpractice claim."

We conclude the evidence is insufficient to show that appellants owed a duty of care to respondents because there is no "clear, certain and undisputed evidence of [Richard's] intent" to benefit respondents by leaving his estate to them instead of to

2

Elizabeth.  (*Gordon v. Ervin Cohen & Jessup LLP* (2023) 88 Cal.App.5th 543, 564 (*Gordon*).)

*Factual Background*

A 2003 restatement of Richard's revocable trust (the ARG Trust) equally divided the residue of his estate into two shares: one share for each of his two sons, Jeffrey and Peter.  Elizabeth would receive only Richard's personal property.

In September 2011 Richard met with Wakeman.  At the time of trial in 2022, for 30 years Wakeman had been certified by the State Bar as a specialist in estate planning, trust, and probate law.  Richard told Wakeman that he wanted half of his estate to go to Jeffrey and the other half to go to the grandchildren, i.e., Peter's children.  Richard said he did not want Peter to inherit a portion of his estate because "Peter had already been well provided for and he didn't really trust Peter to take care of his own kids."

On December 1, 2011, Wakeman met with Richard and Elizabeth.  Wakeman testified that at the meeting Richard had said "he wanted to leave everything to Elizabeth and let her decide what to do with it."  "'All [Richard] said is, "I want it all to go to Elizabeth, and she can decide who gets what" . . . [in her] [c]omplete discretion.'"  Wakeman advised Richard "'that he was essentially disinheriting his grandchildren and his . . . son.'"

Richard told Wakeman "that Peter was likely to sue when he found out what Richard had done, so [Wakeman] advised Richard that it would be best for him to have a neurological exam to have contemporaneous documentation in his file as to his mental capacity."  Richard did so.  In a letter dated March 20, 2012, Dr. Peter Miao wrote: "[Richard] has been under my care for the past many years.  He has had neurological exam recently

and has had a complete neurological work up.  I find him in sound mind & body and is capable of making competent financial and estate planning decisions."

On December 21, 2011, Wakeman sent Richard estate planning documents that, according to Wakeman, carried out Richard's instructions at the December 1, 2011 meeting.  The documents included an irrevocable trust for Jeffrey and an irrevocable trust for the grandchildren.  Wakeman explained: "[A]t the time these [irrevocable] trusts were done, the maximum amount that Richard could leave tax-free to either his children or his grandchildren was $5 million, and anything in excess of $5 million was subject to a 40 percent tax."  "[I]t was contemplated that Richard would gift an interest in [real property he owned known as] Brookfield Farms into these two . . . trusts in order to take advantage of the $5 million exemption that was available at the time."  An inventory of Richard's property shows that, at the time of his death, Brookfield Farms constituted the bulk of his estate's value.

Wakeman also sent Richard an amendment and restatement of his revocable trust, the ARG Trust.  Richard was named as the trustee of the trust, and Elizabeth was named as the successor trustee.  The restatement provided that, upon Richard's death, the trustee shall make a gift of $25,000 to each of three named beneficiaries.  Neither respondents nor Peter would receive a gift.  The restatement continued, "[T]he Trustee shall distribute the rest, residue and remainder of the Trust Estate outright and free of trust to the Settlor's spouse, Elizabeth Rice Grossman."  Wakeman testified, "[I]f Elizabeth predeceased Richard, then [the residue] was going to go 50-50, half to Jeff's trust and half to the grandkids' trust."

4

Wakeman met with Richard on January 17, 2012. The evening before the meeting, Elizabeth emailed Wakeman: "[Richard] doesn't want the beneficiaries changed . . . he doesn't want his intentions changed. He wants his grandchildren's trust to get 50% of the net and Jeff's trust to get the other I think. We can discuss tomorrow. [¶] We are both a little confused on this . . . ."

On January 17, 2012, Richard signed the restatement of the ARG Trust. Richard again said he was leaving everything to Elizabeth and nothing to Jeffrey and the grandchildren "because Elizabeth will make sure they're taken care of."

At trial the following colloquy occurred between respondents' counsel and Wakeman:

> Q. And did you explain to [Richard] that Elizabeth didn't have to necessarily take care of them at all, based on the documents that he had signed?
> A. Yes.
> Q. And you're testifying that he understood that?
> A. Yes.
> Q. And he was okay with that?
> A. He was more than okay with it.
> Q. That's what he wanted?
> A. That's exactly what he wanted.

In March 2012 Richard signed Jeffrey's and the grandchildren's irrevocable trusts. In June 2012 Wakeman met again with Richard and Elizabeth. Richard said he did not want to fund these irrevocable trusts. Richard again said he wanted Brookfield Farms to go "'[o]utright'" "'100% to Elizabeth.'" Wakeman testified, "So what [Richard's] telling me is, 'I want Elizabeth to have everything, and for her to make a

5

determination after I die what, if anything, she wants to put into those two [irrevocable] trusts'" for Jeffrey and the grandchildren.

Elizabeth testified: "[T]he reason that [Richard left his estate] to me was because he wanted me to have the flexibility to give money to the trusts of both the grandchildren and to Jeffrey . . . . [Richard] didn't really trust . . . his son Peter Grossman to take care of his brother [Jeffrey] and . . . [Peter's] children relative to college and that sort of thing, and he knew that I would." "[T]he bottom line was . . . that he trusted me to take care of his grandchildren and his . . . son, Jeffrey," who "has some disabilities."

Laurel Luby, Elizabeth's personal assistant, testified that, "'[p]robably [in] the summer of 2012,'" Richard had told her "'that he was leaving Brookfield Farms to Elizabeth.'" Richard said "'[t]hat he trusted Elizabeth to do . . . what he wished with his estate, that she would do it in the manner that he wanted. And he was assured that she would fund the trust for Jeffrey and for the grandchildren.'"

Meredith Rattay, a former employee of a Grossman Burn Center, testified that in 2012 "in the middle of a telephone conversation [Richard] just said, 'Well, I changed my will. I left everything to Elizabeth.'"

Respondents' witnesses testified that Richard had always expressed deep love and affection for Jeffrey and the grandchildren. Richard repeatedly said he intended to leave his estate to them. He never indicated that he intended to leave his estate to Elizabeth and let her decide how much Jeffrey and the grandchildren would receive. In October 2013 Richard told Dr. Karl Stein, ""I'm keeping the farm going to give to my grandchildren and my son."'" Two days before Richard's death in

6

2014, Richard told Robert Wiltshire that "he wanted [Jeffrey] to be taken care of because he . . . had special needs."

Dr. Jonathan Simons, Richard's stepson, testified that it was "utterly inconceivable that [Richard] would leave his estate to his fourth wife and . . . disinherit his family." It was also "absurd" because "Elizabeth was worth considerably more money than Richard was." Elizabeth testified that in 2000 when she and Richard signed a prenuptial agreement, her "net worth" was "[a]round a hundred million" dollars.

As an expert witness on trusts and estate planning, respondents called attorney Robert Kehr. Kehr testified: "[T]he job of a competent lawyer is not simply to document what the client thinks should be done." "The lawyer is not a secretary; it's not just taking notes and writing stuff down. . . . The lawyer's an advisor, and where there are alternatives, they need to be suggested, with their pros and cons, their costs, and their risks." "I have not seen anything in the materials that I've reviewed that suggests there was any interaction of any significance between Mr. Wakeman and Dr. Richard Grossman about how to accomplish his goals and avoid what he was fearful of. What I have seen instead is that Mr. Wakeman effectively was taking dictation from Dr. Grossman and doing things that created problems and . . . exacerbated family disputes. [¶] I've seen information that suggested that one of Dr. Richard Grossman's main concerns was to take care of his son Jeffrey, who was not fully able to take care of his own needs, and what happened as a result of this estate planning was that Jeffrey was essentially cut out of the . . . estate."

Assuming that Richard had intended to benefit Jeffrey and the grandchildren, Kehr opined that Wakeman's actions fell

"below the standard of care . . . [b]ecause Jeffrey wasn't protected. Jeffrey was left in jeopardy by the actions and decisions made by Dr. Richard Grossman's fourth wife, Elizabeth . . . ."

When Richard died in 2014, "the ARG trust owned Richard's entire estate, including Brookfield Farms." The grandchildrens' and Jeffrey's 2012 irrevocable trusts remained unfunded. After Richard's death, each of the 2012 irrevocable trusts received one-half of the assets of Richard's IRA. Elizabeth had been the sole beneficiary of Richard's IRA, but in September 2012 she informed Wakeman that Richard wanted the beneficiary to be Jeffrey's and the grandchildren's 2012 irrevocable trusts. After Richard's death, a separate "2006 Jeffrey trust" was funded with "[a] $1 million life insurance policy."

Respondents brought a separate probate action against Elizabeth. Pursuant to a settlement of the action, the grandchildren received $2,843,466.39 from the proceeds of the sale of Brookfield Farms. Jeffrey received the same amount. The total amount of the settlement was credited against the jury's damages award of $4,750,000 for the grandchildren and $4,750,000 for Jeffrey. Thus, the damages award was reduced to $1,906,533.61 for the grandchildren and the same amount for Jeffrey ($4,750,000 – $2,843,466.39 = $1,906,533.61). As additional damages consisting of reasonable attorney fees and costs, the trial court awarded $145,000 to the grandchildren and $145,000 to Jeffrey. Accordingly, the total amount of the judgment entered in favor of the grandchildren was $2,051,533.61. A judgment in the same amount was entered in favor of Jeffrey.

*Appellants' Motion for Nonsuit*
*and Request for Jury Instructions*

Appellants moved for nonsuit on the ground that they did not owe a duty of care to respondents: "[I]t was not Mr. Wakeman's duty to ensure that [Richard] left Brookfield Farms or any other asset to [respondents]. His duty was to draft the trust documents to reflect his client's [i.e., Richard's] instructions, which is exactly what he did." The trial court denied the motion for nonsuit.

The trial court refused to give the following jury instruction requested by appellants: "Where there is a question about whether the third-party beneficiary was, in fact, the decedent's intended beneficiary – where intent is placed in issue – the lawyer will not be held accountable to the potential beneficiary." The requested instruction is a verbatim quotation from *Chang v. Lederman* (2009) 172 Cal.App.4th 67, 82 (*Chang*).

*Standard of Review*

The sole issue on appeal is whether appellants owed a duty of care to respondents even though respondents were not their clients. "Whether [such] a duty exists is a question of law that we independently assess." (*Gordon, supra*, 88 Cal.App.5th at p. 554; see *Osornio v. Weingarten* (2004) 124 Cal.App.4th 304, 316 ["On a question of law, we apply a de novo standard of review on appeal. [Citation.] While negligence [in a legal malpractice action] is ordinarily a question of fact, the existence of duty is generally one of law"]; *Chang, supra*, 172 Cal.App.4th at p. 76 ["Whether a lawyer sued for professional negligence owed a duty of care to the plaintiff 'is a question of law and depends on a judicial weighing of the policy considerations for and against the imposition of liability under the circumstances'"]; *Carleton v.*

9

*Tortosa* (1993) 14 Cal.App.4th 745, 754-755 ["The degree of care and skill required to fulfill a professional duty ordinarily is a question of fact and may require testimony by professionals in the field . . . .  However, expert testimony is incompetent on the predicate question whether the duty exists because this is a question of law for the court alone"].)

*The Evidence Is Insufficient to Show that Appellants Owed Respondents a Duty of Care Because Richard's Alleged Intent to Benefit Respondents Is Not Clear, Certain, and Undisputed*

Respondents argue: "It is undisputed that there is not one iota of evidence suggesting that Richard ever had a falling out with his three intended beneficiaries [Jeffrey and the grandhildren].  Indeed, . . . there is a virtually unbroken solid wall of testimony from multiple friends, colleagues, family members, and percipient witnesses that Richard truly loved these close family members and fully wanted to provide for them." "The massive weight of the evidence is that Richard always intended to bequeath his estate to his sole Grandchildren and his special needs son Jeffrey."

Respondents claim that Elizabeth "had legally forsworn" any right to Richard's estate because "Elizabeth and Richard had signed a prenuptial agreement which provided that neither would inherit anything from the other and that all their money and assets would go to their respective heirs.  Nothing in the trial record suggested that that prenuptial contract had ever been formally abrogated."  But the 2000 prenuptial agreement permitted either party to bequeath property to the other party: "Nothing contained in this Agreement shall affect the right of either party hereto to transfer, convey, devise or bequeath any property to the other or to receive any legacy or devise or any

10

other benefit expressly given by any will, codicil, trust or other instrument of the other executed after the date of this Agreement."

In contending that the judgment must be reversed, appellants primarily rely on *Gordon*, *supra*, 88 Cal.App.5th 543. *Gordon* was decided in February 2023, approximately three months after the jury had returned its special verdict in the present case. *Gordon* clarified the duty that attorneys owe to nonclients such as respondents. Respondents acknowledge that *Gordon* "did not purport to cite new law or to change or overrule the holdings in any of the cases decided prior to it."

In *Gordon* the decedent (Claire) had three sons. Kenneth was one of the sons. Claire amended her trust to disinherit Kenneth's three children. Thereafter, with the assistance of her lawyers, Claire created three limited liability companies (LLCs) and transferred property into each of them. Claire "assigned a 30 percent interest in each LLC to each of her three sons and retained a 10 percent interest in each LLC for herself." (*Gordon*, *supra*, 88 Cal.App.5th at p. 551.)

After Claire died, her son "Bruce and his sons Steven and Brian [plaintiffs] . . . sued [Claire's lawyers] for legal malpractice on the theory that the lawyers in drafting the LLC operating agreements did not adhere to Claire's intent because they did not prohibit Kenneth's three children from inheriting any interests in the LLCs. Had the operating agreements done so, plaintiffs alleged, Kenneth's interests in the LLCs would have passed to [Claire's two other sons] upon Kenneth's death . . . ." (*Gordon*, *supra*, 88 Cal.App.5th at p. 553.)

The trial court granted the lawyers' motion for summary judgment. The Court of Appeal affirmed the judgment because of

11

"the absence of any duty running from the lawyers to plaintiffs."
(*Gordon*, *supra*, 88 Cal.App.5th at p. 565.) The court noted: "A
""key element"" of plaintiffs' sole cause of action for malpractice is
""the establishment of a duty by the [lawyer] to the claimant.""
[Citations.] Absent a duty, plaintiffs cannot establish an element
of their malpractice cause of action and defendants are entitled to
summary judgment." (*Id*. at p. 554.)

 *Gordon* continued: "A lawyer has a 'duty . . . to use such
skill, prudence, and diligence as members of [the legal] profession
commonly possess and exercise' when representing a client. . . .
[¶] Although the lawyer's duty typically runs only to the client
because that duty arises from the privity of contract that forms
the lawyer-client relationship [citations], a lawyer can sometimes
owe a duty to third parties who are the *intended beneficiaries* of
the lawyer's legal work for the client, such as when the lawyer is
retained by the client to draft a will, a testamentary trust, or an
inter vivos trust or gift." (*Gordon*, *supra*, 88 Cal.App.5th at pp.
554-555; see *Lucas v. Hamm* (1961) 56 Cal.2d 583, 591 ["We
conclude that intended beneficiaries of a will who lose their
testamentary rights because of failure of the attorney who drew
the will to properly fulfill his obligations under his contract with
the testator may recover as third-party beneficiaries"]; *Heyer v.
Flaig* (1969) 70 Cal.2d 223, 226, disapproved on another ground
in *Laird v. Blacker* (1992) 2 Cal.4th 606, 617, 620 ["An attorney
who negligently fails to fulfill a client's testamentary directions
incurs liability in tort for violating a duty of care owed directly to
the intended beneficiaries"].)

 "[O]ur Supreme Court has . . . articulated eight factors
bearing on whether a lawyer should owe a duty to a

12

nonclient . . . ." (*Gordon, supra*, 88 Cal.App.5th at p. 555.) "After balancing [these] factors . . . , the California courts have uniformly settled upon the following rule: A lawyer has a duty to a nonclient third party only if the client's intent to benefit that third party (in the way the third party asserts in their malpractice claim) is 'clear,' 'certain' and 'undisputed.' [Citations.]" (*Id.* at p. 556.)

"[W]hen the client's intent meets this heightened standard, there is less danger that the lawyer will be subject to conflicting duties to different nonclient beneficiaries because only those beneficiaries as to whom the client's intent is crystal clear may sue for malpractice." (*Gordon, supra*, 88 Cal.App.5th at p. 557.) Moreover, this heightened standard reduces the danger that "the recognition of a duty running to the nonclient plaintiff – and the resultant 'recognition of liability' against the lawyer – 'would impose an undue burden on the profession' . . . [citation] . . . [by] saddling the lawyer with open-ended liability that could act as a disincentive for lawyers to practice in that area of law and hence dry up access to the legal services in that area [citation]." (*Id.* at p. 556.)

*Gordon* concluded that the plaintiffs' evidence did not meet the heightened standard: "[T]he lawyers did not owe plaintiffs a duty to draft the LLC operating agreements in a way that disinherited Kenneth's children because Claire's intent to disinherit Kenneth's children from being assigned any interest in the LLCs was not, as a matter of law, clear, certain or undisputed." (*Gordon, supra*, 88 Cal.App.5th at p. 560.)

*Gordon* set forth guidelines for determining whether a lawyer owes a duty of care to a nonclient: "[C]ourts will recognize a duty to a nonclient plaintiff – and thereby allow that plaintiff to

13

sue the lawyer for legal malpractice – only when the plaintiff, as a threshold matter, establishes that the client, in a clear, certain and undisputed manner, told the lawyer, 'Do *X* (where *X* benefits the plaintiff)." (*Gordon, supra,* 88 Cal.App.5th at p. 556.) "California courts have unfailingly rejected the existence of a duty where there is a question about '*X*.'" (*Id*. at p. 559.)

Here, there is a question about "*X*." According to Wakeman, "*X*" was Richard's unequivocal direction to draft a document that would leave his entire estate to Elizabeth. Richard's intent to take this course of action was corroborated by the testimony of Elizabeth, Laurel Luby, and Meredith Rattay.

Respondents' witnesses testified that Richard had said he wanted to leave his estate to respondents. But the issue is not what Richard told his friends and family members. The issue is what he told Wakeman. "[A] lawyer has no duty to a nonclient plaintiff beyond implementing the client's clear directive to 'Do *X* (when . . . *X* benefits that nonclient plaintiff)." (*Gordon, supra,* 88 Cal.App.5th at p. 559.) Thus, "a lawyer 'who is persuaded of the client's testamentary capacity by his . . . own observations and experience, and who drafts the will accordingly, fulfills that duty of loyalty to the testator[, and he] should not be required to consider the effect of the new will on beneficiaries under a former will or beneficiaries of the new will.' [Citation.] [In addition,] a lawyer who is persuaded of his client's intent to dispose of her property in a certain manner, and who drafts the will accordingly, fulfills his duty of loyalty to his client and is *not* required to urge the testator to consider an alternative plan in order to forestall a claim by someone thereby excluded from the will . . . ." (*Boranian v. Clark* (2004) 123 Cal.App.4th 1012, 1019-1020.)

14

"[A] lawyer's duty to a nonclient does not extend to being a babysitter, a risk mitigation strategist, a sounding board, or a mental health specialist for the client. Making a lawyer liable in malpractice to a nonclient for failing to act in any role beyond the role of implementing the client's undisputed intent to benefit that nonclient is bad public policy because it places an 'incentive [on the lawyer] to exert pressure on [the] client to complete and execute estate planning documents summarily' [citation], a result that contravenes the lawyer's overarching duty of loyalty to the client." (*Gordon*, *supra*, 88 Cal.App.5th at p. 560.) "[W]hen the client's intent [to benefit a nonclient] is anything less than abundantly clear, there is . . . a greater likelihood that the lawyer will be hit with a flood of malpractice claims brought by nonclient plaintiffs asserting that the client 'once promised them *X*' and the like . . . ." (*Id.* at p. 559.)

"Expanding the attorney's duty of care to include . . . third parties who could have been, but were not, named in a bequest, would expose attorneys to impossible duties and limitless liability . . . . [Citation.] Moreover, the results in such lawsuits, if allowed, would inevitably be speculative because the claim necessarily will not arise until the testator or settlor, the only person who can say what he or she intended or explain why a previously announced intention was subsequently modified, has died." (*Chang*, *supra*, 172 Cal.App.4th at p. 86.)

"Applying the principles articulated above, we conclude that [appellants] did not owe [respondents] a duty to draft" the 2012 restatement of the ARG Trust so as to leave Richard's estate to respondents instead of Elizabeth. (*Gordon*, *supra*, 88 Cal.App.5th at p. 560.) "[S]uch a duty would obligate [appellants] to act as a sounding board and babysitter, effectively requiring

15

them to 'second-guess' [Richard's] otherwise clear directive." (*Id.* at p. 562.) Such a duty "would place an intolerable burden upon attorneys. Not only would the attorney be subject to potentially conflicting duties to the client and to potential beneficiaries, but counsel also could be subject to conflicting duties to different sets of beneficiaries. The testator's attorney would be placed in the position of potential liability to either the beneficiaries disinherited if the attorney prepares the [new] will [or trust] or to the potential beneficiaries of the new will [or trust] if the attorney refuses to prepare it in accordance with the testator's wishes." (*Moore v. Anderson Zeigler Disharoon Gallagher & Gray* (2003) 109 Cal.App.4th 1287, 1299.)

*Conclusion*

In *Gordon* the Court of Appeal stated: "We hold, as the courts before us uniformly have, that a nonclient third party can maintain a malpractice action only if there is clear, certain and undisputed evidence of the client's intent to benefit the third party, or to benefit the third party in the way [the third party] claims . . ." (*Gordon*, *supra*, 88 Cal.App.5th at p. 564.) The third party must show that the client's attorney knew or reasonably should have known of this evidence when the alleged malpractice occurred. Attorneys are not clairvoyants capable of ascertaining the unexpressed intent of their clients. (See *id.*, at p. 556 [nonclient plaintiff must "establish[] that the client, in a clear, certain and undisputed manner, told the lawyer, 'Do X,' (where X benefits the plaintiff)"].) Because the evidence of Richard's alleged intent to leave his estate to respondents instead of Elizabeth is not clear, certain, and undisputed, as a matter of law the evidence is insufficient to show that appellants owed a duty of care to respondents in preparing the 2012 restatement of the

16

ARG Trust. Wakeman's testimony, together with the supporting testimony of Elizabeth, Laurel Luby, and Meredith Rattay, shows that the evidence of Richard's alleged intent was disputed.

If Richard had intended to leave his estate to respondents, there would have been no need for him to have obtained the letter from Dr. Miao attesting to his capability of "making competent financial and estate planning decisions." Wakeman advised Richard to obtain the letter because Richard said he wanted to disinherit his children and grandchildren and leave his entire estate to his independently wealthy fourth wife. The imposition of malpractice liability in these circumstances would not only be unjust, it would also "place an 'intolerable' 'burden' on the legal profession." (*Gordon, supra*, 88 Cal.App.5th at p. 559.)

*Disposition*

The judgments are reversed. The matter is remanded to the trial court with directions to enter judgment in appellants' favor. The appeal from the order denying appellants' motion for judgment notwithstanding the verdict is dismissed as moot. Appellants shall recover their costs on appeal.

<u>CERTIFIED FOR PUBLICATION.</u>

YEGAN, Acting P. J.

We concur:

BALTODANO, J.

CODY, J.

Henry J. Walsh, Judge

Superior Court County of Ventura

_____

Murphy Austin Adams Schoenfeld and Ellyn E. Nesbit, for Defendants and Appellants.

Ritt Hodges and D. Jay Ritt; Law Offices of Nicholas S. Nassif and Nicholas S. Nassif, for Plaintiffs and Respondents.